# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| vs. | ) | Case No. 08 CR 206 |
| | ) | |
| YASMEEN STURDIVANT | ) | |

## MEMORANDUM OPINION

MATTHEW F. KENNELLY, District Judge:

The Court issues this Memorandum Opinion to elaborate upon the grounds upon which it excluded certain evidence in defendant Yasmeen Sturdivant's trial for wire fraud. The Court made an oral ruling excluding the evidence on the afternoon of Friday, January 9, 2009, after hearing extensive argument. Defense counsel then moved for a mistrial on the ground that given the volume and prejudicial nature of the excluded evidence, the jury could not be expected to put it aside even if instructed to do so. The Court granted defense counsel's motion. This Memorandum Opinion is being issued on Wednesday, January 13, 2009.

## Background

The indictment in this case charged Yasmeen Sturdivant and her husband, Steven Sturdivant, with wire fraud, and also charged Mr. Sturdivant with bankruptcy fraud. Mr. Sturdivant entered a guilty plea and did not go to trial; he awaits sentencing.

The indictment alleged that from 1996 through March 2006, Mr. and Ms. Sturdivant schemed to defraud nine named lenders in connection with mortgage loans, by intentionally misrepresenting their income, assets, debts, and liabilities, the purchase

prices for the properties and the down payments they provided to the sellers, and their intention to repay the loans. The indictment further alleged the following particulars:

- the defendants falsified their employment income to make it appear they qualified for the loans they sought;

- they provided false and altered tax returns to substantiate their false statements about their income;

- they inflated the purchases prices of two of the properties to increase the amounts they could borrow;

- they falsely represented they had provided certain funds as down payments;

- they submitted altered checks to support their claims about the down payments;

- they overstated the rental income that two of the properties generated;

- they provided false information about their bank balances;

- they caused checks to be disbursed on two of the loans, in 1998, to "Yasmeen Khan" to disguise their receipt of the check, to repay a nonexistent first mortgage in one instance and as nonexistent earnest money in another instance;

- they stalled collection efforts by filing multiple bankruptcy cases;

- they refinanced the loans in greater amounts than they owed on earlier loans to obtain proceeds for themselves;

- they conducted a "sham sale" of one property in 2005 to generate proceeds for themselves and to pay off a loan; and

- Mr. Sturdivant quitclaimed his interests in the properties to Ms. Sturdivant to stave off collection efforts.

The three wire fraud charges alleged wire transfers that took place on various dates 2005 and 2006.

The evidence at trial concerned purchases of, and mortgage loans on, four properties. The properties were located on South Kimbark Avenue in Chicago, South Dorchester Avenue in Chicago, South Greenwood Avenue in Dolton, and Sara Court in Crete. With regard to the Kimbark property, an apartment building, the government offered evidence concerning the purchase of the property in 1998, a refinancing in 2002, and another refinancing in 2006. The government's evidence concerning the Dorchester property, a two-flat building, involved its purchase in 1998, a refinancing in 2004, and the alleged "sham sale" in 2005. With regard to the Greenwood property, the government's evidence concerned the purchase of the property in 1998. The government's evidence regarding the Sara Court property involved its purchase in 2005.

The evidence that the Court excluded involved, primarily, the 1998 and 2002 transactions. In each of the 1998 transactions, Mr. Sturdivant purchased the property in his name alone. In addition, and significantly for present purposes, Mr. Sturdivant applied for and obtained financing in his own name for each of those purchases. There was no evidence that Ms. Sturdivant applied (either herself or jointly) for financing in connection with the 1998 transactions or that she took title of any of the properties in 1998 either in her own name or jointly with Mr. Sturdivant. The same was true of the 2002 refinancing of the Kimbark property; Mr. Sturdivant applied for and obtained the refinancing exclusively in his own name. In other words, the claimed false statements to lenders in 1998 and 2002 were made in loan applications that Mr. Sturdivant signed

3

and submitted to obtain financing in his name alone.

The evidence regarding the 2004-2006 transactions was different. At the time of each of those transactions, Ms. Sturdivant owned the property (Mr. Sturdivant having deeded it over to her) or was purchasing it. The applications for financing were made in her name. The Court did not exclude the government's evidence regarding these transactions.

Over half the government's evidence (in terms of the time consumed to present it) concerned the 1998 and 2002 transactions in which Mr. Sturdivant was the sole borrower. Among other things, the government offered voluminous evidence that Mr. Sturdivant's 1998 and 2002 loan applications – which, again, he made exclusively in his own name – included a myriad of false representations regarding his income, employment, and various other matters. The government offered no evidence that Ms. Sturdivant completed or assisted in completing those loan applications. (It did offer some evidence concerning her involvement in two closings and one purchase negotiation, a topic to which the Court will return shortly.)

The government also offered evidence that Mr. Sturdivant filed six bankruptcy petitions: one in 1999, two in 2000, one in 2003, one in 2004, and one in 2005. As noted earlier, the government contended that the petitions were part of an effort to stave off lenders' efforts to collect mortgage loans that Mr. Sturdivant had earlier obtained. Mr. Sturdivant – the sole obligor on those mortgage loans – filed the bankruptcy petitions exclusively on his own behalf. The government offered no evidence that Ms. Sturdivant was involved in the preparation or filing of any of the petitions. The bankruptcy evidence was part of what the Court excluded in its oral

4

ruling.

In addition, the government offered evidence that starting in 2003, Mr. Sturdivant, at the time the sole owner of the three properties then at issue, quitclaimed his interests in the properties to Ms. Sturdivant. The Court did not exclude this evidence.

As noted earlier, only Ms. Sturdivant went to trial in this case. Her counsel repeatedly and consistently objected to the admission of evidence regarding the 1998 and 2002 transactions (in particular, Mr. Sturdivant's allegedly false loan applications) and Mr. Sturdivant's bankruptcy filings. Counsel argued the evidence should not be admitted because it was not connected to Ms. Sturdivant, the only defendant on trial. The Court, believing that the connection eventually would be made as the case progressed, admitted the evidence subject to a later motion to strike.

After the conclusion of the government's evidence, defense counsel renewed her objections and moved to strike the evidence regarding the 1998 and 2002 transactions, as well as the evidence concerning Mr. Sturdivant's bankruptcy filings. After hearing extensive argument, the Court granted defense counsel's motion to strike, in an oral ruling made on January 9.

As noted above, the Court did not exclude any of the government's evidence concerning the refinancing of the Dorchester and Kimbark properties in, respectively, 2004 and 2006, the alleged "sham sale" of the Dorchester property in 2005, or the purchase of the Sara Court property in 2005. As indicated earlier, there was evidence tending to show Ms. Sturdivant's involvement in each of those transactions – which, the government contended, likewise involved false representations to lenders.

5

In its oral ruling, made after hearing extensive arguments, the Court addressed issues of relevance, unfair prejudice, and admission of "other act" evidence. The Court adheres to that ruling but believes that further elaboration of the basis for the ruling is needed to supplement the oral comments the Court made immediately following the attorneys' arguments. Specifically, the Court's oral ruling did not sufficiently emphasize the role of unfair prejudice (under Federal Rule of Evidence 403) in the Court's determination to exclude the evidence regarding Mr. Sturdivant's allegedly false loan applications and his bankruptcy filings.

The evidence regarding Mr. Sturdivant's false statements to the lenders in 1998 and 2002 was quite damning vis-a-vis Mr. Sturdivant – who was not on trial – and it was highly prejudicial to Ms. Sturdivant, who was on trial. The government's evidence regarding these transactions laid out, in painstaking detail, a plethora of false representations by Mr. Sturdivant regarding his employment, his income, the value of the properties he was purchasing, the amount of rental income the properties generated, earnest money, and other matters. This evidence included documents given to lenders that the government contended had been falsified, including altered copies of income tax returns and altered checks.

No one involved in any of the 1998 or 2002 transactions (i.e., no mortgage brokers, lenders, or title company representatives) testified at trial. Rather, the government offered all of its evidence about those transactions through documents it introduced via "records custodians." There was no testimony, and no other evidence, that Ms. Sturdivant made any false representations relating to Mr. Sturdivant's loan applications. Each of the loan applications and related documents reflected on its face

6

that it was being submitted by Mr. Sturdivant, and by him alone. None of the applications reflected that any of the brokers or lenders had received information from Ms. Sturdivant.

The evidence regarding the allegedly false 1988 and 2002 loan applications tended to show a scheme to defraud the lenders involved in those transactions. But it did not tend to show – or, in the words of Rule 401, make it "more probable" – that Ms. Sturdivant, the only defendant on trial, participated in any scheme to defraud those lenders. The government's evidence, as noted earlier, included no evidence at all that Ms. Sturdivant participated in, or even knew about, the false statements Mr. Sturdivant made to the lenders. Nor was there evidence from which her knowledge of those false statements (let alone participation in making them) reasonably could be inferred.

The government argued that Ms. Sturdivant received proceeds from one or more of the 1998 / 2002 transactions; she conducted some part of the purchase negotiations with the seller of the Kimbark property in 1998; and she attended one or two of the 1998 closings. None of this, however, made it more probable that she participated in the loan application process, which is where Mr. Sturdivant allegedly made the false statements that the government offered. The Court rejects the government's contention that Ms. Sturdivant's presence at one or more closings, or her receipt of proceeds at or after those closings, was indicative of her awareness of false statements that had been made in the loan application process, which had occurred prior to the closings. Similarly, the government's evidence that a person identified as Ms. Sturdivant's mother verified Mr. Sturdivant's employment and that some of the altered checks had originally been payable to Ms. Sturdivant's daughter did not make it more probable that Ms.

7

Sturdivant herself participated in, or even knew of, the false statements that Mr. Sturdivant was claimed to have made to the lenders during the loan application process.[1]

In sum, the evidence regarding Mr. Sturdivant's alleged false statements in the 1998 and 2002 loan applications was not relevant to show Ms. Sturdivant's participation in a scheme to defraud the lenders in those transactions.

A good deal of the Court's discussion during its oral ruling on January 9 concerned whether the 1998 and 2002 loan transactions arguably could be said to have involved the same scheme as the later loan transactions in which Ms. Sturdivant was the borrower (or seller). The Court commented during its ruling that no such determination reasonably could be made, and it continues to adhere to that view. Whether all of the transactions were part of the same scheme turns largely whether they involved a common criminal plan or intent, a rule the Court derived from cases arising from different, but related, contexts. *See, e.g., United States v. Dvorak*, 115 F.3d 1339, 1348 (7th Cir. 1997) ("same criminal plan or intent"); *United States v. Adeniji,* 221 F.3d 1020, 1026 (7th Cir. 2000). Based upon the factors the Court identified in its oral ruling, the Court does not believe that a reasonable determination can be made that all of the transactions alleged involved a single scheme, despite what the indictment alleged. Thus Ms. Sturdivant's arguable later participation in a scheme or schemes to defraud other lenders in loan applications relating to the same properties

---

[1] The Court necessarily addresses each item of evidence separately, but it also considered the totality of the evidence offered by the government regarding the 1998 and 2002 transactions in assessing its relevance, probative value, and potential for unfair prejudice.

8

does not make her responsible for Mr. Sturdivant's earlier misrepresentations in a way that might render evidence of those misrepresentations admissible.

It is hornbook law, of course, that a person need not be involved in all aspects of a scheme or know everything other schemers might be doing to be considered as a participant in a common scheme. Because a single scheme was alleged in the case, it was appropriate to join in a single indictment the various transactions alleged to constitute part of that scheme. But the fact that an indictment alleges a single scheme does not make everything *claimed* to be part of that scheme automatically admissible in a separate trial involving only one of the claimed schemers. Issues of relevance under Rule 401 and unfair prejudice under Rule 403 still must be taken into account.

In a trial like this one involving Ms. Sturdivant alone, the voluminous evidence of Mr. Sturdivant's alleged false statements to lenders in 1998 and 2002 was of minimal probative value in proving Ms. Sturdivant's guilt of the charged offenses, and it was enormously, and unfairly, prejudicial. The government essentially introduced a mountain of evidence relating to frauds committed by a co-schemer, in which the defendant on trial had not participated. Absent some proper evidentiary basis for connecting Ms. Sturdivant to Mr. Sturdivant's 1998 / 2002 misrepresentations to lenders – a basis that did not exist – the prejudice to her from the admission of the evidence of Mr. Sturdivant's false statements can only be characterized as unfair: it focused the jury on crimes committed by Ms. Sturdivant's co-schemer and tended to paint her as guilty by association.

As indicated above, the Court originally admitted the evidence of Mr. Sturdivant's alleged misrepresentations in 1998 and 2002 believing that it would be connected to

Ms. Sturdivant as the case progressed. As the Court has described, it ultimately concluded that connection had not been made. The primary basis for the Court's ruling determination to exclude the evidence (though, concededly, not the point that took up most of the Court's oral discussion on January 9) – was the matter of unfair prejudice to Ms. Sturdivant, which overwhelmed any arguably probative value this evidence had in a trial involving her alone. This evidence diverted the jury's focus to another person's wrongdoing and away from whether Ms. Sturdivant was proven to have, herself, knowingly participated in a scheme to defraud.

The Court has already explained why it believes the probative value of this evidence to prove the scheme to defraud and Ms. Sturdivant's participation in it was, at best, minimal. One might also argue, however, that the evidence concerning the 1998 and 2002 transactions ought to have been admitted to place in context the later transactions in which Ms. Sturdivant herself was claimed to. That contention fails. The evidence regarding the earlier loan applications went far beyond what might have been needed to put the 2004-2006 transactions in context. Indeed, all that was truly needed to do that was evidence that, at some point in time, Ms. Sturdivant became the owner of the properties. That is why the Court did not exclude evidence regarding the previously-mentioned quitclaim deeds, in which Mr. Sturdivant transferred certain properties to Ms. Sturdivant.

Had the government confined its evidence regarding the 1998 and 2002 transactions to identifying who owned the properties and when and, perhaps, identifying lenders paid off in later transactions and the amounts they were owed, it would not have faced a significant problem when the Court reassessed the admissibility of the

evidence on January 9.  The critical point, however, concerns (as the Court has stated) the admission of evidence, in a trial concerning only Ms. Sturdivant, of Mr. Sturdivant's wrongdoing in making the earlier loan applications, in the absence of any testimony or exhibits reflecting Ms. Sturdivant's involvement in those applications.

The evidence regarding Mr. Sturdivant's bankruptcies likewise was of little probative value (at best) and was highly and unfairly prejudicial to Ms. Sturdivant. Again, the key factor is the absence of evidence reflecting Ms. Sturdivant's involvement in the bankruptcy filings.  Absent such a connection, admission of this evidence unfairly prejudiced Ms. Sturdivant by suggesting her apparent association with what the indictment characterized as an untoward effort to prevent lenders from collecting what Mr. Sturdivant owed them.  The evidence of Mr. Sturdivant's bankruptcies had little, if any, probative value in showing the background for Ms. Sturdivant's eventual ownership of the properties and her refinancing efforts – given, in particular, the admission of the evidence regarding Mr. Sturdivant's quitclaiming of the properties to Ms. Sturdivant.

The Court notes, finally, that there is one limited aspect in which it might be willing to reconsider the admission of particular aspects of the evidence regarding the 1998 and 2002 transactions.  To the extent the government's evidence indicated that Ms. Sturdivant might have received proceeds from one or more of those transactions under false pretenses, such evidence arguably might be properly admissible against her on some basis – subject, of course, to consideration of arguments regarding relevance, probative value, and unfair prejudice.  Determination of that issue, of course,

will have to await another day.

        /s Matthew F. Kennelly
      MATTHEW F. KENNELLY
Date:  January 13, 2009        United States District Judge